RANDY S. GROSSMAN
United States Attorney
DAVID CHU (CA Bar No. 242046)
VALERIE H. CHU (CA Bar No. 241709)
MARK W. PLETCHER (CO Bar No. 034615)
MICHELLE L. WASSERMAN (CA Bar No. 254686)
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101
Telephone: (619) 546-6750

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 17-CR-0623-JLS |
|---|---|
| v. | **RESPONSE BY THE UNITED STATES IN OPPOSITION TO DEFENDANT LOVELESS'S RENEWED MOTION TO STRIKE [DOC 956]** |
| DAVID NEWLAND, et. al, | |
| Defendants. | |

Still pending on the docket is a motion by Defendant Loveless, joined by co-defendants, challenging the authenticity of documents admitted into evidence at trial. Doc. 956. The defense moved several times, on the same bases, to preclude these same documents prior to and throughout trial. The Court denied those motions, and the defense had an opportunity at trial to attack those exhibits before the jury. Defendant Loveless filed this "renewed" motion after the close of evidence and prior to closing arguments. The Court proceeded to closing arguments, and the jury returned verdicts as to four of the five defendants. To extent the motion is still relevant, it fails on the merits for all the same reasons the Court previously ruled.

The Court appropriately assessed the foundation for the authenticity of the exhibits admitted at trial. Those exhibits included records which were properly certified by Leonard Francis as business records of Glenn Defense Marine, Asia

1  ("GDMA"), pursuant to Fed. R. Crim. P. 803(6) and 902(11).  The Court determined
2  that the certification met the elements required in those rules of evidence, in light of
3  Francis's role and the statements contained therein.  As the rules expressly contemplate
4  a custodian certification taking the place of live testimony, nothing about the Court's
5  determination was predicated on Francis testifying at trial.  The defense was thereafter
6  permitted to introduce the certification, then cross-examine, and introduce defense
7  exhibits – including excerpts of Francis's podcast—on the question of authenticity.

8        Moreover, in addition to the business records certification, the United States
9  presented alternate foundation for the admissibility of many of the same documents,
10 including the testimony of witnesses with knowledge, certifications that the documents
11 came from an electronic device maintained in the custody of law enforcement, and the
12 documents' distinctive characteristics (including metadata and unique email
13 addresses).

14       In other words, the admitted evidence met the very low bar for authenticity.  *See*
15 Fed. R. Evid. Rule 901(a) (there need only be evidence "sufficient to support a finding
16 that the matter in question is what its proponent claims").  Indeed, to satisfy Rule
17 901(a), the proponent must "make only a prima facie showing of authenticity so that a
18 reasonable juror could find in favor of authenticity or identification." *United States v.*
19 *Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir. 1991). Once the proponent meets this
20 burden, "the probative force of the evidence offered is, ultimately, an issue for the
21 jury." *Id*.

22       The Court appropriately assessed that a prima facie showing of authenticity had
23 been made for each of the trial exhibits, and permitted ample opportunity for the
24 defense to challenge the evidence at trial.  Defendant Loveless's Renewed Motion
25 Regarding the Government's Certifications (Doc. 956) raises no new bases to upset
26
27
28

this Court's prior rulings, and his motion to strike exhibits that have already been submitted to the jury should be denied.[1]

# I

# POINTS AND AUTHORITIES

## A. BUSINESS RECORDS CERTIFICATION WAS SUFFICIENT AND IMPEACHMENT WAS PERMITTED

The first complaint raised in Defendant's motion is that the Francis's certification of business records was somehow inadequate without Francis himself testifying. Doc. 956 p. 1-2. The Court repeatedly ruled that the certification was sufficient, and nothing in the record reflects that the Court ever made any of its rulings *tentative* or *provisional*, conditioned upon Francis testifying. *See* Doc. 633 (11/18/21 RT) at 31; 3/3/22 AM RT p. 27-28.

Contrary to Defendant's notion that this was an "end run" around the Rules of Evidence, or occasioned by the need to keep Francis "hidden" from the jury, Doc. 956 p. 3, it is an *express purpose* of the Rule, and not an incidental or untoward consequence, that a written declaration can be submitted to avoid the time and expense of a custodian witness testifying. *See* Fed. R. Evid. 803, Advisory Committee's Note to 2000 Amendments (foundation requirements of Rule 803(6) rule can be satisfied "without the expense and inconvenience of producing time-consuming foundation witnesses.") *See also United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir. 2003) ("*Instead* of providing live testimony from a custodian or other qualified witness, the proponent of business records may choose to present the foundation by a certification that complies with Rule 902(11) ....") (internal citation omitted) (emphasis added in original). Establishing authenticity without a live witness is not only an acceptable way to satisfy the foundation requirements, but the "[t]he *most appropriate way* to view Rule 902(11)." *United States v. Kahre*, 610 F. Supp. 2d 1261, 1263 (D. Nev.

---

[1] The United States incorporates herein the arguments set forth in its prior filings, *see* Docs. 528, 601, 622, 786, 789, 931, 948, and the Court's rulings thereon.

- 3 -

2009) (emphasis added) ("Thus, the most appropriate way to view Rule 902(11) is as the functional equivalent of foundation testimony offered to authenticate a business record tendered under Rule 803(6) because the declaration permitted by Rule 902(11) serves the same purpose as authenticating testimony.")[2]

As previously indicated, Francis reviewed the list of proposed business records with his attorneys, then reviewed a revised list due to a mix-up with the numbering. Doc. 622 p. 9-10; Doc. 931 p. 11-12. He did not certify as a business record every document submitted to him by the prosecution team. Doc. 922, p. 15 n. 15.

The Court ruled that the corrected certification met the requirements of Fed. R. Evid. 902(11). Doc. 633 (11/18/21 RT) at 31. As the Court recognized, that the records were prepared by a criminal, and concerned illicit activities, did not make them so untrustworthy as to preclude the records from satisfying the business records exception in the rules of evidence. *United States v. Foster*, 711 F.2d 871, 882 n.6 (9th Cir. 1983) (holding drug ledgers admitted as business records); *see also United States v. Baxter*, 492 F.2d 150, 164 (9th Cir. 1973) (noting "[t]he principles of efficient accounting apply just as readily to an illicit enterprise as they do in a licit business"); *Arena v. United States*, 226 F.2d 227, 234 (9th Cir. 1955) (affirming admissibility of betting records in illegal bookmaking operation). *See* 3/17/22 PM RT p. 27 (the Court acknowledged that the caselaw let "heads of drug-trafficking organizations and all kinds of people certify things…I think he could certify that.")

As the trial unfolded, the Court did not abandon its pretrial decision-making, but in fact repeated its ruling mid-trial. For example, the Court overruled foundation and speculation objections to Aruffo's testimony, and admitted proffered documents as business records. Reading into the record its prior ruling from November 2021, the Court recited:

---

[2]   *See also DirecTV, Inc. v. Murray*, 307 F. Supp. 2d 764, 772 n.3 (D.S.C. 2004) ("Rule 902(11) was designed to work in tandem with an amendment to Rule 803(6) to allow proponents of business records to qualify them for admittance with an affidavit or similar written statement *rather than live testimony*.") (emphasis added).

> THE COURT FURTHER FINDS THAT THE CERTIFICATIONS TO BE LEGALLY SUFFICIENT UNDER 902(11) AND 18 USC 3505. FINALLY, WHILE THIS RULING ENCOMPASSES A DETERMINATION THAT GDMA DOCUMENTS GENERALLY QUALIFY AS BUSINESS RECORDS UNDER 803(6), THE COURT WILL ENTERTAIN OBJECTIONS AS TO THE ADMISSION OF SPECIFIC DOCUMENTS AS BUSINESS RECORDS DURING THE COURSE OF TRIAL.

3/3/22 AM RT p. 27-28, citing Doc. 633 (11/18/21 RT) at 31. The Court thereupon admitted hotel records as business records pursuant to the certification at trial, reaffirming that there was "sufficient indicia that all these requirements [for business records] have been met." *Id. See also* 3/17/22 PM RT p. 29 (Court: "They accept certifications from drug trafficking organizations, and they can certify this, they can certify that, and I think for these purposes this is acceptable. It has been accepted by the Court and we are in that posture.")

As it indicated it would, the Court proceeded to field and resolve objections to exhibits at the time they were proffered for admission. Holding true to its gatekeeping function, the Court declined to admit some documents certified as business records. *See, e.g.*, 3/15/20 AM RT p. 85 (sustaining hearsay objections and declining to admit Exhibits 2-483 and 2-484).

In addition, the Court permitted the defense to introduce the actual business records certification, then to impeach Francis's statements in that certification. 3/21/22 AM RT p. 13-14. Thus, the Court expressly allowed challenges that "the possible source of the information or other circumstances indicate a lack of trustworthiness," as contemplated by Rule 803(6). *See* Fed. R. Evid. 803(6), Advisory Committee Notes. These included many attacks on Francis's record-keeping, his bias and motives, his access to his attorneys while in custody, his control and influence over his employees and investigator, and his record of fraud and deceit.[3]

---

[3] At the same time, it should be noted, the defense presented evidence suggesting that the Navy had no greater friend than Francis, that Francis was a trusted partner of the Navy, that he dined with, entertained, and was photographed with numerous Admirals, that he attended the retirement ceremony for the Chief of Naval Operations, that he attended change of command ceremonies at the U.S. Naval Academy, and that

In the instant motion, Defendant reprises previously-raised and already-resolved attacks. Doc. 956 p. 5. *See generally* Doc. 902, p. 5-9; Doc. 931 p. 12-14. First: that there was evidence that GDMA fabricated invoices does not undermine the reliability of the records admitted as GDMA business records. As the Court has recognized, and as alleged in the Indictment and established by trial witnesses, GDMA fabricated invoices to supply plausible "cover" for the free hotel rooms Francis gave as bribes to co-defendants and co-conspirators. *See* 3/21/22 AM RT p. 43 (Aruffo testifying that Francis created fake receipts); 5/4/22 AM RT p. 19, 28, 70 (Shedd testifying about fake receipts); Indictment p. 16 ¶ 35(r) (it was a manner and means of the conspiracy that conspirators created fraudulent receipts), p. 17 (Overt Act A2) (Francis created fraudulent receipts for the Petrus dinner), A89 (Francis distributed fictitious $126 per night hotel receipts). Indeed, internal GDMA emails establish the very reliability of these fabricated invoices, as having been prepared and transmitted by employees as part and parcel of GDMA's business of bribing Navy officials. *See* Lausman 55 (internal GDMA communications admitted by the defense discussing that company would hide true cost of hotel rooms); Dolan Ex. 8 (same). Evidence at trial showed that GDMA employees sent the fabricated emails to Francis, and Francis forwarded them to Shedd. Shedd then disbursed them to the 0-6 Captains. *See* Exhibit 81-239 (Francis attaching fake invoices in email to Shedd). Accordingly, the fabricated invoices actually underscore, and do not undermine, the reliability of the documents as GDMA's business records.[4]

Second, Defendant Loveless claims that Francis "was working to 'evade and clean up' his servers." Doc. 956 p. 5. This characterization of the record is incorrect,

---

he received "Bravo Zulu" letters from prominent officials up to and including the Commander in Chief of the United States.

[4] *See also* 3/21/22 AM RT p. 43-45 (counsel for Loveless citing Francis's business records certification as a basis to admit a defense exhibit, Loveless 76, a fake receipt, into evidence). *See also* 3/14/2022 AM RT p. 23-24 (Mr. Mancano acknowledging that 2-566, a payment voucher for Manila Hotel, "may very well be a business record of GDMA").

as has been previously pointed out. Doc. 786 p. 3, 9; Doc. 931 p. 12-13. Accurately put, Francis claimed that John Beliveau *advised him* how to "evade and clean up" the servers prior to Francis's arrest, and explained that all he did was shift to using a Chinese server. Francis ultimately affirmed as to his emails that "they never did get deleted." Doc. 786, p. 3-4, 9; Doc. 931 p. 12-13. This allegation does not undermine the reliability of records that actually were preserved and certified and presented as evidence. In any case, the Court appropriately determined that the records met the low bar for authenticity, then permitted cross-examination and impeachment to those documents, including by admission of Francis's podcast statements.

Defendant's remaining attacks (on Francis's motive to seek leniency when he signed the certification, findings by a military tribunal as to Francis's credibility, and disputed accusations about child pornography on Francis's computer) have either already been presented and argued to the jury (in the case of his motive to cooperate), or are general allegations pertaining to Francis's wrongdoing and bad conduct that do not cast doubt on the source or circumstances of the creation of the GDMA business records. In any case, extensive evidence regarding Francis's untrustworthiness was presented to the jury at trial (see transcript citations at Doc. 956 p. 5), allowing the jurors to decide what weight to give documents sourced from him. *See e.g., United States v. Baxter*, 492 F.2d 150, 165 (9th Cir. 1973) (rejecting claim that documents were "inherently unreliable" because they were prepared in part by a cooperator for the purpose of the trial after he had "defected to the Government" and agreed to cooperate).

//

//

//

## B. DOCUMENTS FROM LAPTOP, HARD DRIVES, AND ATTORNEYS WERE SUFFICIENTLY AUTHENTICATED[5]

Exhibit Series 70-, as DeLaPena explained at trial, consisted of documents from Francis's laptop that was seized on the day of his arrest on September 16, 2013. 4/4/22 PM RT p.75-77. Those documents were processed through a process of digital authentication. *Id*. p. 76. Since their seizure, the digital records had been in the possession, custody, and control of federal law enforcement agents, and were stored and processed in accordance with forensic methodology. *Id.* p. 77.

Defendant complains that Agent Cordell DeLaPena was not a competent witness because he did not personally seize the laptop from Francis. Doc. 956 p. 2-3. But in connection with the chain of custody, "[t]here is no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence." *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960). Instead, "[w]here no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties." *Id.* In the context of the chain of custody, the presumption of regularity means that the Court may presume that public officials have properly handled evidence in their custody. *Id.* Thus, the Court is entitled to presume that evidence seized by law enforcement from Francis upon arrest has been properly maintained since then. *See also United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991) (the possibility of a break in the chain of custody goes to the weight of the evidence, not admissibility); *United States v. Solorio*, 669 F.3d 943, 954 (9th Cir. 2012) ("The possibility of a break in the chain of custody goes only to the weight of the evidence.")

---

[5] Defendant moved to strike all documents from Exhibit Series 70, 74, 75, 76, 81, and 82. Doc. 956 p. 7. The Court declined to admit any exhibits from 74, 75, and 76, which leaves his challenges to Exhibit Series 70, 81, and 82. *See* Doc. 987 (Court's Exhibit List).

In line with *Gallego*, the Ninth Circuit has held that the prosecution need not proffer the testimony of the law enforcement officers who first seized the evidence in order for that evidence to be admissible. In *United States v. Boyce*, 594 F.2d 1246, 1248, 1252 (9th Cir. 1979), an espionage case where the defendants were charged with selling top secret material to the U.S.S.R., a co-defendant was arrested by Mexican police in front of the Soviet embassy in Mexico City. The Mexican police found filmstrips containing top secret information in the possession of the co-defendant. *Id.* at 128. At trial, the Mexican police officers did not testify. The Ninth Circuit rejected an authenticity challenge, despite the absence of testimony from the Mexican officers who first seized them. *Id. See also Harrington,* 923 F. 2d at 1371 ("the prosecution was not required to call the custodian of the evidence").

Here, in addition to testimony from Agent DeLaPena regarding the manner in which the laptop was seized, processed, and maintained by law enforcement, the prosecution proffered the chain of custody documents for the laptop, which the defense examined mid-trial. 4/4/22 PM RT p. 70-71. Thereafter, the Court expressly determined that the items seized by law enforcement were trustworthy and that the objections (including that DeLaPena was not personally present at the seizure) went to weight, not admissibility.[6]

With respect to the materials handed over by Francis's lawyers, at Exhibit Series 81 and 82, there was extensive evidence of authenticity evident in the documents themselves, specifically, metadata reflecting that the documents had passed through GDMA and U.S. Navy servers, their similarity to documents contained on the laptop seized by law enforcement from Francis, and distinctive characteristics, such as specific email addresses and signatures.

---

[6] The Court explained, "When things were seized…they were seized. There's a chain of custody. The witness was not there, but there is an element of trustworthiness to this based on … the chain of custody. It goes to weight, not admissibility." 4/4/22 PM RT p. 67.

|   |   |
|---|---|
| 1 | As previously stated, while it is true that the United States originally planned to |
| 2 | call the investigator who first obtained the electronic materials and delivered them to |
| 3 | Francis's lawyers, Doc. 902 at 8, the Court's rulings obviated the need for that witness. |
| 4 | *See Boyce*, 594 F.2d at 1252 (rejecting claim that the seizing agent was required to |
| 5 | establish authenticity, since the district court found that there was adequate foundation |
| 6 | without such testimony). Ultimately the Court admitted such documents over |
| 7 | objection. Contrary to the suggestion by Defendant Loveless, the Court did not reserve |
| 8 | or make provisional its admission of the exhibits "based on the false pretense that |
| 9 | competent witnesses would testify later at trial." Doc. 956 p. 4. Nevertheless, as |
| 10 | discussed further below, multiple competent witnesses testified about the exhibits |
| 11 | admitted from Exhibit Series 81- and 82-. |
| 12 | Defendant's new suggestions that Agent De La Pena's testimony was |
| 13 | insufficient foundation because "De La Pena had no clue about Mr. Hernandez's |
| 14 | collection strategy" and "Mr. Francis (or his agents) directed the search for documents |
| 15 | as part of his cooperation," (Doc. 956 pp. 3-4) are equally meritless. Neither the |
| 16 | collection strategy utilized by Esteban Hernandez to collect the documents nor that |
| 17 | Francis had a hand in choosing what documents to collect, undermines the Court's |
| 18 | conclusion that the documents actually collected and turned over to the lawyers were |
| 19 | what they purported to be: emails exchanged by Francis and other GDMA employees |
| 20 | with conspirators, and financial records maintained by GDMA. *See Baxter*, 492 F.2d |
| 21 | at 165 (even the fact that the cooperator had deliberately removed pages incriminating |
| 22 | himself and his friend in what he supplied to the government – in other words, that he |
| 23 | chose what to provide -- did not make the remaining records unreliable; the "deficiency |
| 24 | in the records does not change the fact that the accuracy of the remaining pages was |
| 25 | sufficiently established."); *Foster*, 711 F.2d at 882 (fact that drug ledger was |
| 26 | incomplete and had blank pages did not render it inadmissible; "The accuracy of the |
| 27 | remaining pages was not altered simply because Logan did not record every heroin |
| 28 |   |

sale that occurred."); *Harrington*, 923 F.2d at 1374 (merely raising the possibility of tampering is not sufficient to render evidence inadmissible).

In addition, witnesses identified and testified about many of the documents in the Exhibit 81- and 82- Series, further confirming the correctness of the Court's rulings that there was sufficient foundation for those documents.

## C. ADDITIONAL CORROBORATION OF AUTHENTICITY

The Court correctly ruled that the admitted exhibits satisfied the low bar for authenticity. Moreover, the authenticity of the materials introduced as business records, as sourced from Francis's laptop, as obtained from the nine hard drives, and as passed along by Francis's attorneys was further corroborated by other sources. Throughout trial, witnesses – including Edmund Aruffo, Steven Barney, Jesus Cantu, Edward "Chip" Zawislak, Jeffrey Rathbun, Alexander Gillett, and Stephen Shedd – testified about emails they sent or received or other documents regarding which they had personal knowledge. *See* Federal Rule of Evidence 901(b)(1) (one illustration to establish authenticity is the "[t]estimony of witness with knowledge"); *United States v. Gal*, 606 F. App'x 868, 875 (9th Cir. 2015) (admitting emails where victims authenticated the emails, and the emails reflected on their faces that they were sent by "Steve Carpenter").

First, as to exhibits certified as business records, these were generally introduced as entries in Exhibit Series 2-. *See* 3/9/22 PM RT p. 11 (prosecutor explaining that Exhibit Series 2- were certified business records). Of the exhibits in the 2- series, as reflected in the Court's index and in the trial transcripts, Edmund Aruffo testified regarding about 90.[7] Many of those documents were emails that he sent or received. Additional documents were photographs of people he personally recognized. A handful of documents were GDMA payment vouchers and invoices for events Aruffo

---

[7] This and other figures in this section are compiled from the Court's exhibit list, paralegal record-keeping, and the trial transcripts currently available. Illustrative record citations have been provided. Complete transcripts for all trial days are still awaited and thus the numbers are the current best approximation.

personally attended or arranged – for which Aruffo verified that the date, location, and attendees were accurately reflected in the GDMA documents. Doc. 987.

At least fifteen exhibits in the Exhibit 2- series were admitted by witness Jesus Cantu on direct, and at least one more on cross-examination. These consisted of emails to and from him, emails referencing events or people he knew about, and photos from events he attended.[8] In some cases, the document was admitted though Cantu (in which case the business record certification was not relied upon at all to authenticate).

Similarly, other witnesses confirmed that emails certified as GDMA business records were accurate emails they sent or received. Stephen Barney discussed what had been admitted as Exhibit 2-530, an ethics email he wrote. Shedd discussed three exhibits from the 2-series (Exhibits 2-294, 2-295, 2-352), Zawislak discussed three (Exhibits 2-285, 2-319 and 2-321), and Gillett discussed one (Exhibit 2-525), supplying an additional layer of authentication that the emails were what they purported to be. In some cases, while a document may have been included in Francis's business records certification, and given a Series 2 number, it was actually introduced at trial via the witness and not in reliance upon the certification at all. *See, e.g.*, Exhibits 2-352 (admitted via Shedd); 2-319 and 2-321 (admitted via Zawislak). *See* Doc. 987 (reflecting dates of admission associated with those witnesses' testimony).

The record reflects that at least eleven documents admitted in Series 2- were also separately backed up by a Rule 902(14) certification as a digitally authenticated copy from Francis's laptop.[9] And at least another two of the certified business records were backed up by a 902(14) certification as being from Alex Wisidagama's laptop.[10]

---

[8]  *See, e.g.*, 3/28/22 AM RT p. 7-9, 102, 108, 126, 136, 139-140, 143-144.
[9]  These included Exhibits 2-22, 2-94, 2-122, 2-137, 2-140, 2-146, 2-163, 2-484, 2-588, 2-589, 2-592, and 2-606. *See, e.g.,* 3/9/22 PM RT p. 34; 3/10/22 AM RT p. 22-24, 28, 31, 43; 3/14/22 AM RT p. 17, 35, 62, 77.
[10]  These included Exhibits 2-91 and 2-601. *See* 3/9/22 PM RT p. 84, 3/10/22 AM RT p. 37.

As with the other categories of documents, witnesses with personal knowledge testified regarding documents from the 70- series, supplying further corroboration for their authenticity. For example, Exhibits 70-36 and 70-7 were authenticated by Zawislak as being a true and correct copy of emails received into his military account. He also testified that they were identical in substance to Dolan 111 and Dolan 116, respectively.[11] Exhibit 70-356 was admitted through Alexander Gillett, who sent it from his Cooltoad account.[12]

As to Exhibit Series 81-, Stephen Shedd testified about at least a dozen that had been first introduced by DeLaPena as having come from the nine hard drives from Covington and Burling.[13] Separately, at least another dozen emails were introduced through Shedd which happened to come from the nine hard drives (and had a Series 81- exhibit number), but for which Shedd supplied the authentication as emails from his own Cooltoad account. Similarly, Alexander Gillett discussed Exhibits 81-86 and 81-87, emails he sent from his "dingo11" Cooltoad account, after those emails had been originally introduced through DeLaPena as having come from the nine hard drives. 5/3/22 AM RT p. 24-26. Jeffrey Rathbun testified about Exhibit 81-25, confirming that he had sent the first email in the chain. 5/2/22 AM RT p. 75.

Finally, the exhibits admitted in the Trial Exhibit 82 Series were primarily GDMA payment vouchers, credit card statements, and various hotel invoices. Doc. 987. Once again, there was testimony corroborating the accuracy of those documents. For example, Shedd testified, based on his presence at those events, that individuals reflected in payment invoices were present at the hotel referenced, during the dates

---

[11]   4/20/22 RT PM p. 14-15, 24.
[12]   5/3/22 AM RT p. 40.
[13]   These included Exhibits 81-10 (5/11/2022 PM RT p. 68); 81-186 (5/5/22 PM RT p. 33); 81-236 (*id.* p. 31); 81-88 (*id.* pg. 11); 81-200 (*id.* p. 32); 81-94 (*id.* p. 17); 81-93 (*id.* p. 16); 81-91 (*id.* p.13); 81-73 (5/5/22 AM RT p. 85); 81-71 (5/5/22 AM RT p. 84); 81-69 (*id.* p. 82); and 81-48 (*id.* p. 25).

specified. These included stays at the JW Marriott (Exhibit 82-11), the Conrad Bangkok (Exhibit 82-13), and the Shangri-La Makati (Exhibit 82-18).

In addition to corroboration of authenticity from witness testimony, the documents themselves had distinctive characteristics that helped establish foundation. *See* Fed. R. Evid. 901(4) (foundation may be established by "distinctive characteristics and the like," including appearance, contents, substance, and internal patterns). These included unique email addresses; nicknames and common phrases used by the co-conspirators; metadata tying the emails to servers associated with GDMA and the U.S. Navy; and the similarity of appearance, letterhead, logos, content, and substance in the documents. For example, as the Court observed, invoices purporting to be from the Shangri-La Hotel contained in the records of GDMA appeared similar or identical to other documents from the Shangri-La. *See* Exhibit 82-15; 7/21/22 RT p. 5 (finding that Makati Shangri-La records were appropriately admitted as GDMA business records pursuant to Francis's certification, and noting that "other Shangri-La records are similar or identical to the exhibit at issue.") [14]

//

//

//

//

---

[14] Also, the documents were consistent across sources. For example, there were documents admitted as a Series 2- exhibit (reflecting the business record certification) and also a Series 70- exhibit (from the Francis laptop). *See, e.g.,* Exhibits 70-36 and 2-285 (4/11/22 p. 71 and 4/11/22 RT p. 69); Exhibits 70-48 and 2-264 (4/12/22 RT p. 45 and 3/14/22 RT p. 84); Exhibits 70-136, 70-158 and 2-477 (4/6/22 RT p. 123, 4/12/22 RT p. 50, 3/15/22 p. 57); and Exhibits 70-299 and 2-146 (4/6/22 RT p. 35 and 3/14/22 RT p. 35). Another document was admitted as a Series 2- exhibit and a Series 82 exhibit (from the scanned documents from Singapore). *See* Exhibits 82-11 and 2-313 (4/6/22 RT p. 156 and 4/12/22 RT p. 86). Additional documents were admitted under Series 2- and Series 81- (from the Covington lawyers). See Exhibit 81-7 and 2-242 (3/147/22 RT p. 21 and 4/6/22 RT p. 56).

## III

## CONCLUSION

The Court properly performed its gatekeeping function when it came to the exhibits proffered at trial, and should deny Defendant Loveless's motion to strike all trial exhibits sourced from Leonard Francis.

DATED: September 14, 2022

Respectfully submitted,
RANDY S. GROSSMAN
United States Attorney

/s/ Valerie Chu
Assistant United States Attorney